GEORGE v. SCHUMAN.

1. CONTRACTS—OPTIONS—CONSIDERATION—VENDOR AND PURCHASER
   —TENDER—ACCEPTANCE.
   That the agreed amount to be paid for an option contract
   for the purchase of land was tendered but not accepted
   does not make the contract gratuitous for want of con-
   sideration.

2. TENDER—PAYMENT.
   An unconditional tender of the specified amount for the
   purpose of avoiding loss of any rights or privileges is
   equivalent to payment as to all things incidental or con-
   sequential to the obligation to pay.

3. CONTRACTS—OPTIONS—CONSIDERATION—VENDOR AND PURCHASER.
   An option on land is not an agreement to sell, but a mere
   offer to sell, with a contract not to withdraw that offer
   within a specified time; and there must be some legal
   consideration to validate it.

4. SAME—NOMINAL CONSIDERATION—VALIDITY.
   An option is valid if supported by a nominal money con-
   sideration, and is not revocable by the optionor during its
   time limit. Distinguishing Axe v. Tolbert, 179 Mich. 556.

5. SPECIFIC PERFORMANCE — CONSIDERATION — EQUITY — ADEQUATE
   CONSIDERATION—VENDOR AND PURCHASER.
   Where a contract for the sale of land follows from accept-
   ance of an option, chancery courts, though recognizing
   the rule of law as applied to the option consideration,
   hold that, in cases where specific performance is sought,
   sufficiency of price or adequacy of consideration must be
   in accordance with the equitable, not the legal, rule.

6. CONTRACTS—OPTIONS—REVOCATION—LACHES.
   Where defendant signed an unambiguous option contract
   for the sale of land, a copy of which she had in her
   possession for nearly a year, and she gave no notice of
   any revocation or intention to repudiate until, under
   changed conditions, plaintiff had made an advantageous
   agreement to sell, relying on his option, her claim of
   revocation is not tenable.
       202—Mich.—16.

7. SAME—FRAUD—EVIDENCE—SUFFICIENCY.
   The claim of unfairness, overreaching, or deception by
   which defendant was led to sign the option agreement
   under a misapprehension as to its terms, *held*, not sup-
   ported by the evidence.

8. SAME—PRESUMPTIONS.
   Where defendant gave no indication that she did not under-
   stand the option, which she signed after it was read over
   to her and others, she will be presumed to have signed
   it understandingly.

9. SAME—CONSIDERATION—EQUITY.
   The finding of the court below that the option price of
   $1,000 per acre was, at the time the option was given,
   a fair market price and all that could have been obtained
   in the open market, *held*, supported by the evidence.

10. SPECIFIC PERFORMANCE—OPTIONS — LAND CONTRACTS — VENDOR
    AND PURCHASER.
    The contract being complete in its terms, and not being
    shown to have been procured by any misrepresentation
    or fraud, and plaintiff having fully performed or made
    tender of full performance which was kept good by tender
    into court of the full contract price, the decree of the
    court below in favor of plaintiff for specific performance
    will be affirmed.

Appeal from Wayne; Kendrick, J., presiding. Sub-
mitted January 18, 1918. (Docket No. 148.) Decided
July 18, 1918.

Bill by Frederick E. George against Mary Schuman
for the specific performance of a land contract. From
a decree for plaintiff, defendant appeals. Affirmed.

*Charles R. Robertson*, for plaintiff.

*Dohany & Dohany*, for defendant.

STEERE, J. Plaintiff's bill is filed to enforce specific
performance by defendant of the following option con-
tract for the purchase of 37.95 acres of land, called
the "George" homestead, situate on the "Miller road"

beyond the westerly city limits of Detroit, in the township of Springwells:

"This contract, made this 22d day of May, A. D. 1915, by and between Mary Schuman, Catherine Haag, Caroline George and John George, children of Martin George, deceased, and Emma George Bull, Ada George Poet, Abbie George Reese and Robert George and Margaret George, his wife, children of Henry George, deceased, and grandchildren of the said Martin George, deceased, as parties of the first part and Frederick E. George as party of the second part, Witnesseth;

"That the said parties of the first part in consideration of the sum of one ($1.00) dollar, to them and each of them in hand paid by the party of the second part, do hereby agree that they and each of them shall and will at any time within two years from the date hereof, at the written request of the said party of the second part, execute and deliver to him, the said party of the second part, or to any persons as he, the said party of the second part shall direct in writing, a good and sufficient warranty deed of all his, her or their interests in and to the following described land situate in the township of Springwells, and described as (legal description of the land) for the sum of one thousand ($1,000) dollars, an acre, as their various interests in said land appear, payable as follows: One-half of the amount due each and every one at the time of conveyance and the remaining one-half within three years from date of conveyance.

"And the said parties of the first part do hereby further agree that they shall and will not within the period of two years from date hereof sell, convey, mortgage, or otherwise encumber the said land or any part thereof or do, or permit to be done, any act or deed to diminish or encumber the title to said land.

"It is agreed by and between the parties hereto, that if the said party of the second part at the expiration of the aforesaid limited time shall have declined or omitted to make application for the purchase of said land at the price aforesaid, then this instrument shall be void and the above sum of one ($1.00) dollar, so paid aforesaid, shall be forfeited by the said party of the second part and the said parties of the first part

shall have the right to retain the same as liquidated damages, and the said party of the second part shall relinquish to said parties of the first part all claim to the said land, either in law or equity, and all claim to any moneys paid under this contract and no claim of said party of the second part under this contract shall then be effectual.

"In witness whereof the parties of the first part have hereunto set their hands and seals the day and year first above written.

|                       |        |
|-----------------------|--------|
| "Mary Schuman         | L. S.  |
| "Catherine Haag       | L. S.  |
| "Caroline George      | L. S.  |
| "John George          | L. S.  |
| "Emma S. Bull         | L. S.  |
| "Robert H. George     | L. S.  |
| "Margaret George      | L. S.  |
| "Abbie George Reese   | L. S.  |
| "Ada George Poet      | L. S.  |
| "Frederick George     | L. S." |

"Witness:
"Charles R. Robertson
"Mary Malone."

This instrument was duly acknowledged by defendant, and others, on May 26, 1915.

Mary Schuman, Catherine Haag and Caroline, John and Frederick George are the living children of Martin George who died in 1881 seized of this property, which was the family homestead, consisting of a square 40-acre farm less a right of way conveyed to the Pere Marquette railway. The remaining five of the ten parties to the contract are four nieces and a nephew of the others. Each of them owned an undivided interest in the land, acquired by devise or inheritance, that of each of the two brothers and three sisters, children of Martin, being computed as 164/960 each, and of their nephew and nieces 35/960 each. Martin George's wife was given a life estate in this property by his will. Plaintiff was the youngest of the George children and remained at the old home. After his mother's death,

which occurred some 20 years before this contract of 1915 was executed, he continued to reside there engaged in farming and teaming. He paid the other owners some rent for about 17 years, but for the last three years before the option contract was given had not done so. After the mother's death there was talk from time to time amongst the owners of interests in this property, or certain of them, about selling it, but nothing was done, either from lack of market or of united effort or agreement, until 1915.

Mrs. Schuman, the defendant, who was the oldest child of the Martin George family, had married over 50 years before and gone with her husband to his farm in Taylor township located, as her son describes it, "on the Wabash railroad about 3½ miles south of Dearborn village" in Wayne county (which is not over ten miles from Detroit), continuing to live there with him until his death, and then with her son until the hearing in this case, in 1917.

Just what the steps were which led up to signing this instrument is told in a fragmentary way and the parties to it are not altogether in harmony as to what was done and said. Plaintiff's claim and testimony is that ever since their mother died they were talking from time to time about selling the property but not much could be got for it until 1915, when some of the owners, particularly the sisters who were anxious to sell and get the benefit of their interest in the estate, asked him if there was any sale for it, in answer to which he asked what they wanted for it and they said they did not know; that later he, John and Caroline George met at Mrs. Haag's and discussed the matter when he offered to buy it at $1,000 per acre if they were all willing to sell; that defendant to whom a letter had been sent was not present nor the nephews and nieces but he told those present if they would get together and make a price he would buy; that learning

later from one of the sisters Mrs. Schuman had heard of the meeting and was sorry she could not be there he arranged for another meeting at the office of Mr. Robertson, an attorney who had done business for members of the family, and defendant attended with her sisters, niece and brother John when all present signed the option which the attorney had prepared at his request, read over and explained to them, the others in interest not present signing later.

It is not disputed that defendant, after meeting with her two sisters and a niece, went with them to the attorney's office and signed the instrument there, as did the others present, after it had been read to them, and she with the others was given a copy of it which she took home with her.

The first offer plaintiff obtained after receiving this option was $1,000 per acre from a Mr. Porath, in July, 1915, later a Mr. Beyers offered him $1,100 and some time that fall he received an offer from a Mr. Curtiss of $1,200 and offered to take $1,350 which Curtiss then refused to give, but in January, 1916, offered to take it at that price, which plaintiff declined. Mr. Fred E. Gregory, an attorney of Detroit who had formerly lived in Dearborn and later was in the employ of Henry Ford buying property for him in that vicinity had, about May 20, 1915, quietly begun buying land in Springwells township in the vicinity of the River Rouge, the secret purpose being to secure a site for the Ford tractor plant. He testified that he kept the knowledge of his action and of the man for whom he wanted it from persons in that neighborhood and everybody else so far as possible, but he met people there who knew he was representing and making purchases for Mr. Ford; that the owners of property wanted were offered fair prices and some of them sold considerably cheaper than they would the next year, saying further:

"This boom in the price of real estate in the west end of town started about June, 1915, after it became thoroughly known about the Ford tractor and from that time on until last year prices soared pretty high. * * * There was as I remember it and as I view since the announcement came out in the papers that we had bought this large tract of land there, that real estate men flocked in pretty thick in that section to buy something. Of course the owners of the property were offered fair prices, and they sold, some of them cheaper, considerable cheaper probably than they would the next year, than those that held their property; that next year would bring it up to 1916. I think those that held their property got higher prices for it in 1916 than they did in 1917. I don't know anything about prices, particularly this year, I don't know of any sales made this year out through there."

As a result of this fortuitous trend of events plaintiff sold the property in question on March 13, 1916, to J. C. Hudson of Detroit for $80,000 on a land contract in which he agreed to secure deeds from the other owners according to the option he held, and perfect the title, sufficient being paid him on the contract for that purpose. Time was given him to perfect title, as probation of the estate of his father, Martin George, was then in progress before the probate court, and a difference between his brother John George and wife in the courts was also recognized in the contract as a cause of delay in perfecting the title ultimately to be conveyed by delivery of a deed and abstract showing a merchantable title.

Having entered into this agreement plaintiff proceeded to avail himself of his option rights and so notified all parties to it. They all executed deeds conveying their interests to him on receipt of the amount due them by the terms of the contract except defendant, who refused, and his brother John George, who was then willing but unable to do so because of his pending domestic entanglements. Plaintiff then gave

defendant a written notice and request for a deed under the terms of her contract, followed by tender of the amount due her with deed to him for her signature. Upon her refusal to accept the money and sign the deed this bill was filed.

Defendant's contention is, as stated in her counsel's brief:

"*First*, that plaintiff was guilty of unfairness, and overreaching in procuring her signature to Exhibit 1 (the option contract) and that she signed Exhibit 1 under a misapprehension as to its terms; *second*, that Exhibit 1 is void because it is not based upon a substantial consideration."

As to the latter it is urged that the nominal consideration of one dollar was never actually paid and the gratuitous offer to sell was revoked before accepted in writing as the option provided and therefore it never became an enforceable contract. The testimony is conclusive that when the contract was signed and delivered plaintiff tendered defendant and others who had signed payment of a dollar each which they recognized but declined as not wanting it then, defendant saying, as plaintiff testified, "never mind, we don't need the dollar." That the agreed amount tendered was not accepted does not make the contract gratuitous for want of consideration. An unconditional tender of the specified amount for the purpose of avoiding loss of any rights or privilege is equivalent to payment as to all things incidental or consequential to the obligation to pay.

As to the sufficiency or adequacy of the consideration it is to be borne in mind that an option is not an agreement to sell, but a mere offer to sell with a contract not to withdraw that offer within a specified time. For this contract there must be some legal consideration to validate it. Upon this proposition it is said in James on Option Contracts, § 325:

"It is established by the great weight of judicial authority that a nominal sum of money is a sufficient consideration for an option contract, meaning thereby that an option contract supported by a nominal money consideration is not revocable by the optionor during its time limit."

But as to the distinct consideration for the contract of sale which follows or results from acceptance of the offer chancery courts, though recognizing the rule of law as applied to the option consideration, hold that in cases where specific performance is sought the value of the property sold, sufficiency of price or adequacy of consideration must be in accordance with the equitable, not the legal, rule on that subject. While all facts and circumstances connected with the transaction are to be weighed together, including the nature of and consideration for the option which leads into the contract of purchase, when passing upon questions of misrepresentation, unfairness, fraud or other characteristics which militate against the relief asked, the sufficiency of consideration to support the option is properly to be determined by the rule of law, and the adequacy of consideration for the contract of sale which it is sought to enforce by equitable principles.

It is urged for defendant that this court has held in effect that a nominal consideration of one dollar is not adequate to validate as a binding contract an option for purchase of land, citing *Axe* v. *Tolbert,* 179 Mich. 556. The court was there considering an instrument of mixed phraseology purporting to be an option, but held otherwise, for which no consideration was in fact paid or tendered when obtained, although it contained a recital and acknowledgment of a "valuable consideration" which was nominal in the sense of "existing in name only; not real or substantial" (Black's Law Dictionary)—not substantial as something of value actually existing, because merely seeming or imaginary. In

that case the instrument was not signed by the claimed optionor and was gratuitous because without payment, tender or assumption of obligation to pay. Here plaintiff signed the option contract which obligated him to pay $9 for the right to purchase within a specified time the varied, outstanding interests in a piece of then farming land of which he was part owner and in possession, making tender of payment as specified to defendant and the other parties present at the time they signed it. There was no occasion or intent to say or hold in the *Axe Case* that a consideration of one dollar actually paid or legally tendered was not adequate to render an option contract binding as a legal proposition. In *Mier* v. *Hadden*, 148 Mich. 488, where the consideration in an option contract giving the right to purchase a farm within a stated time was $1, this court plainly said:

"Options for the purchase of land, where based on a valid consideration, are valid contracts, and may be specifically enforced."

This option was a written instrument relating to an interest in land requiring acceptance to be in writing. Defendant's claimed revocation was not in writing, but an oral refusal to deed on payment to her of the purchase price according to the terms of her written agreement, a true copy of which she had received when she signed the original and taken home with her, nearly a year before. Its terms are not ambiguous. She had all that time to examine it and consult others about it. She gave no notice of any revocation or intention to repudiate until under changed conditions and enhanced prices plaintiff had made an advantageous agreement to sell and convey, relying on his option, against which she had during all the time he held it made no suggestion of objection. Her claim of revocation is not tenable.

On the claim that relief should be denied because of unfairness, overreaching, or deception by which defendant was led to sign the agreement under a misapprehension as to its terms defendant testified that she never talked with plaintiff about his buying the farm and there is no testimony in the record that he or any one for him ever made any misrepresentation, deceptive proposal or promise, or false statement to her by which she was deceived into signing the option. The most which can be claimed upon that proposition is that he had present special knowledge of material facts bearing upon the value of the property unknown to her and concealed his knowledge from her. There is no evidence that he had any knowledge the Ford tractor plant or other new industries would be, or were likely to be, located in that vicinity and as a result a sudden real estate boom would develop in that section the following year, when "the real estate men flocked in pretty thick." He positively denies any knowledge of the situation or prospects beyond that open to all. The land purchased for or to be used in connection with the site of the Ford plant, which was secured as secretly as possible by Gregory, lies along the south side of the Michigan Central railroad track, between it and the River Rouge, nearly a mile from the property involved in this suit which was not wanted for that purpose. This land was purchased by Hudson from plaintiff nearly a year after his option was obtained. Gregory, who quietly engineered and financed the purchase, testified that while it was likely to have gone to Henry Ford,

"The real purchaser of the Martin George homestead is Robert Oakman, who is a large stockholder in a corporation known as the Ford Highway. * * * Mr. Robert Oakman claimed he was going to build what is known as the Ford Highway from the contemplated site of the tractor plant extending around to Woodward avenue."

On the day defendant signed this option she was driven in an automobile from her home to that of her sister Caroline, in Detroit, by her son, a middle-aged man who testified at the hearing of his mother's mental condition, "As far as her mind goes it is as good as ever." She went with her sister to the office of Mr. Robertson, who, Caroline testified, had takèn care of her law matters for many years and who had prepared the option at plaintiff's request according to the terms he stated. He testified that when the parties came to his office to sign it he assumed they had agreed on the terms as given him by plaintiff, that he had no interest in the matter except his employment to draw up the papers, had not given plaintiff any advice as to advisability of the investment and knew nothing about Gregory buying any real estate down there or anything of that kind; saying of the transaction:

"I explained to them that I had been asked to prepare this option and I read the option over to them and it was discussed. After reading this over, Caroline George carried on the conversation for the others. I presume it was probably because she knew me better than the others. She said in a few words, 'What does all that mean, Mr. Robertson?' I says, 'It means that if Fred George offers to pay you at the rate of $1,000 an acre for your interest in that land within two years, you are to deed it to him,' and then we had a talk and I explained to them how I would send this option, together with a copy of it to Mrs. Poet in Colorado. I explained to them the different interest that they severally had in the property. * * * I also explained to them at that time how Fred George was to take care of the expenses in closing up the father's estate which was satisfactory to them. * * * I had known from Caroline George that they wanted to sell the property. * * * No indication was given to me that Mrs. Schuman did not have the full use of her faculties, I didn't think in matters of this kind she ought to have the benefit of counsel because I knew they wanted to sell the property, they accepted it after it was explained to them."

It is very manifest that as the result of industrial developments which came to that locality and the real estate boom of the ensuing year, the entire aspect of that rural district changed physically and in values to the marvel of all. Ordinary farms from which those who owned and ran them could extract little beyond a modest living became fortunes. There, as in other sections of Detroit and its environments, viewed in the light of subsequent events, many of those who parted with their holdings too soon found difficulty in viewing the fact complacently, as this record and others from that county somewhat analogous show. In that frame of mind, as their testimony plainly indicates, Catherine Haag, Caroline George and Emma Bull, who, after holding copies of the option for near a year, had signed deeds and accepted the money due them according to its terms when requested, join with defendant in testifying that they supposed they were signing an agreement giving plaintiff the right to sell the property for them. None of them testifies to any statement, conversation, or agreement by or with plaintiff to that effect, nor do they relate any previous talk between themselves indicating that such was the expressed bargain and they intended to only give him an agency. Mrs. Haag, called by defendant, said all members of the family had spoken about wanting to sell the old homestead a few years before 1915, and some of them talked it over at her house that winter; that she went to the attorney's office and sat listening to the conversation without asking any questions, could not say whether the paper was read to her before signing, did not know what it purported to be or how she came to sign it; and asked by defendant's counsel:

"When you went to Mr. Robertson's office to sign the deed, did you go and sign it because you wanted to sell to Fred at the rate of $1,000 an acre or because you had to sell on account of having signed the option?" answered, "Well, I don't know.

"*Q.* You are unable to tell?

"*A.* No."

Caroline George admitted the paper was read over to them and thought it was read no different than as she heard it in court, did not think anything was done to mislead, knew the price of $1,000 per acre was decided upon, knew plaintiff had two years' permission to sell the place, and in the talk she had with him he never told her the rest would share equally in the profits with him, and said "my idea of an option was that I was to sell the property." Emma Bull said she heard the paper read and Miss George asked questions about it and the attorney answered them, but she did not remember the exact words of the answer. John George testified that he was not present at the attorney's office when his sisters signed the option, but was at Mrs. Haag's home once with Caroline and Fred who in a conversation about selling the property inquired of the rest if they would take $1,000 an acre and give him an option for it, and they said they would. Robert George, the nephew, also was not present when his aunts signed, was in the real estate business when he testified and had previously been a motorman in Detroit, stated that the option was read to him, that he considered as real estate values then were $1,000 an acre was a fair value for the property and he signed the paper understandingly. His wife signing with him said she knew she was signing an option and had "learned through family gossip, I suppose, what price was going to be fixed on this land."

It is urged that defendant was old and feeble, not experienced in business matters, living in the country with her son who looked after her business matters for her and who was not informed of this transaction at the time of its occurrence. She owned other property beside her interest in this homestead, and, according

to her own testimony and his, the extent to which he looked after her business was leasing her farm from her, paying her taxes on it, sometimes going to the bank for her and buying a tract of land, called the Adams property, of which she was part owner, and a party to giving him an option and selling it to him in 1914. She also was a party to an important real estate deal in 1916, in which her son admitted she transacted her own business when she joined the other owners, Caroline George, Mrs. Haag, John George and his wife, in an option to Hudson for the sale of a piece of land, called the Tice property, at $2,000 per acre. When cross-examined as to this transaction she suggested it had nothing to do with the George case, but she understood that transaction quite clearly "because it was my business" and she knew the place was sold at $2,000 per acre. Although making general denials and insisting on lack of knowledge or remembrance of details as to the transaction under consideration, suggestive of the possibility of effect of price upon memory, she stated as to it

"If I got what I wanted I would sign a deed. I told him I would not deed him that property according to that option."

She had spent her life in the vicinity of Detroit and was familiar with this property upon which she grew to womanhood and which lay between the home in which she lived thereafter and the city. She was not acting alone in this transaction nor under the influence of those who would intentionally ill advise her, against her own interest, for plaintiff's benefit. The interests of those with whom she was most closely associated were on the same side of the deal as hers. She is presumed to understandingly have signed this option which was read to her before signing and if, as she claims, she did not fully apprehend its import the fact was not made manifest by her at that time

nor until prices and conditions had radically changed, although she was in possession of a copy of it all the time with ample opportunity to satisfy herself of its contents by personal examination of it or by consulting others. Her son testified that her mentality was unimpaired, and of the claim that she was "feeble in mind and body" the trial judge before whom the testimony was taken in open court states in his opinion:

"I think the testimony shows that she was 71 years old at the time, but a careful view of her and inspection of her abilities upon the trial indicated to the court, she was a woman of fair understanding. It developed that she transacted certain very large negotiations herself and that while she claims she advised with her son there has been no testimony developed that he ever gave her any advice concerning the sale of her property; that she took that upon herself and managed it. She seems to be clear in her mind at the present time, fully comprehending and understanding her affairs, somewhat enfeebled physically as the testimony shows, which has grown upon her since the transaction of making this option some two years before."

There were ten owners of undivided interests in this property including plaintiff, and the estate of their common ancestor from whom their varied interests were acquired was yet in probate. Relying upon the option plaintiff after a considerable lapse of time negotiated a sale of his own interest and those for which he held the option together, for a stipulated price, obligating himself to perfect through the option and probate court a merchantable title. That no objection or question of any kind was raised against the option by defendant or the others until after he had assumed those obligations is at least an equitable element in support of his request for relief. We agree with the trial court that the evidence before the court indicates that at the time this option was given $1,000

per acre "would be a fair market price and all that could have been obtained in the open market for this property" in the condition it then was as to title and otherwise. The contract was complete in its terms and is not shown to have been procured by any misrepresentation or fraud. Plaintiff has fully performed or made tender of full performance on his part which he has kept good by tender into court of the full contract price, and we see no reason to disturb the conclusion of the trial court that he is entitled to performance by defendant on her part according to the terms of her written understanding.

The decree will therefore stand affirmed, with costs to plaintiff.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.